UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BEIRNE WEALTH CONSULTING
SERVICES, LLC,

        Plaintiff/
        Counterclaim Defendant,

– *against* –

CHRISTOPHER ENGLEBERT,
JAMIE ENGLEBERT, *and*
ENGLEBERT FINANCIAL ADVISERS, LLC,

        Defendants/
        Counterclaim Plaintiffs/
        Third-Party Plaintiffs,

– *against* –

JOHN-OLIVER BEIRNE
*and* ELIZABETH GARNTO,

        Third-Party Defendants.

**OPINION & ORDER**

19 Civ. 7936 (ER)

RAMOS, D.J.:

When Jamie and Christopher Englebert joined Beirne Wealth Consulting from another wealth management firm, they signed a number of agreements that restricted their use of Beirne's proprietary information and forbid them from soliciting or servicing former Beirne clients for a term of two years should they leave the firm. Yet, two months after being fired, the Engleberts acknowledge that they are servicing former Beirne clients and continue to do so to this day. Beirne now seeks a preliminary injunction ordering the Engleberts and their firm, Englebert Financial Advisers,[1] to stop soliciting and servicing Beirnes' former clients while a broader litigation involving the circumstances surrounding the Engleberts' termination proceeds.

---

[1] The Engleberts are citizens of Pennsylvania, and they are the sole members of Englebert Financial Advising, LLC. Beirne Wealth Consulting Services is a Delaware limited liability company based in Connecticut with members that are all citizens of states other than Pennsylvania. Decl. of John-Oliver Beirne, Doc. 67-1. This Court has subject matter jurisdiction under 28 U.S.C. § 1332.

Because accepting old clients who seek to switch from Beirne to the Engleberts' new firm would irreparably harm Beirne, and because Beirne is likely to succeed on its breach of contract cause of action, the Court grants Beirne's motion for a preliminary injunction.

I. **BACKGROUND**

Jamie and Christopher Englebert are a married couple that worked together in the investment advising industry and are based in Pennsylvania. Decl. of John-Oliver Beirne ("Beirne Decl.") ¶ 3, Doc. 35. Christopher worked as an investment adviser while Jamie worked in client management and operations. Christopher was employed by Morgan Stanley before moving to Beirne in 2014. Defs.' Mem. Ex. 1 ("C. Englebert Aff.") ¶¶ 3, 4, Doc. 55. When Christopher and Jamie joined Beirne in January 2014, they executed several agreements. Christopher signed an asset purchase agreement, an employment agreement, and a confidentiality and non-solicitation agreement. Jamie signed a confidentiality and non-solicitation agreement.

A. **The Agreements**

Only Christopher Englebert was a party to the asset purchase agreement. Beirne Decl. Ex. A ("APA"). The agreement provided for the sale of Englebert's personal goodwill associated with his clients at Morgan Stanley in exchange for a sum of $147,500. APA art. 2. Although the agreement included bars on competing with Beirne and soliciting Beirne's clients should Englebert leave Beirne, those clauses expired by January 2019. *See* APA § 8.1. Separately, Englebert claims that Beirne promised to "secure and transition" the clients that remained with Morgan Stanley — a task that "should have been easy since Morgan Stanley did not want to keep most of [that] business." C. Englebert Aff. ¶ 6.

Christopher Englebert also signed an employment agreement. Beirne Decl. Exs. B ("Emp. Agreement"). The agreement, *inter alia*, identified his employment as "at-will," set initial compensation, and set procedures around termination with and without

cause. Emp. Agreement §§ 5, 7, 12, 13. It prohibited Englebert from using Beirne's trade secrets "for any purpose other than the purpose of conducting the business of the Company." Emp. Agreement § 15. The employment agreement also included a bar against soliciting Beirne clients — but not servicing clients — for a period of 12 months should Englebert leave Beirne. Emp. Agreement § 18(a). Finally, the agreement indicated both that Englebert agreed that a breach would cause Beirne to "suffer immediate and irreparable harm and that money damages [would] not be adequate to compensate [Beirne] or to protect and preserve the status quo" and that he "consents to the issuance of a temporary restraining order or a preliminary or permanent injunction." Emp. Agreement § 19 (second quotation in all caps in original).

Both Engleberts signed confidentiality and non-solicitation agreements. Beirne Decl. Ex. C, D ("CNS Agreements"). Those agreements forbid the use of Beirne's confidential information "for any purpose . . . except in the course of performing duties assigned" by Beirne, and they forbid the Engleberts from "removing any Confidential Information from the premises of [Beirne] in either original or copied form, except in the ordinary course of conducting business . . . ." CNS Agreements § 3. The agreements also included a provision that prohibited the Engleberts from "solicit[ing] the sale of, market[ing], or sell[ing] products or services similar to those sold or provided by [Beirne]" to Beirne clients for a period of 24 months should the Engleberts leave Beirne. CNS Agreements § 5. Like the employment agreement, the confidentiality and non-solicitation agreements indicated that the Engleberts "recognize[] that any breach of this Agreement would result in irreparable injury" and that Beirne would be entitled to seek an injunction if necessary. CNS Agreements § 8.

### B. The Breakdown of the Englebert–Beirne Relationship

The Engleberts contend that their time at Beirne was rocky from the beginning. According to the Engleberts' affidavits, Beirne failed to provide the couple with satisfactory marketing and administrative support during their time with the firm. Defs.'

Mem. Ex. 2 ("J. Englebert Aff.") ¶¶ 4, 5. They also claim that Beirne bungled the transition of accounts from Morgan Stanley, and that Beirne took too high of a portion of the Englebert's profits. C. Englebert Aff. ¶¶ 6, 8.

By 2019, the Engleberts had begun to consider starting their own firm. They registered "Englebert Financial Advisers" as a Pennsylvania limited liability company in January. Beirne Decl. Ex. I. In June, Jamie printed out hard copies of client summaries at Beirne's Pennsylvania office and took those hard copies home. C. Englebert Aff. ¶ At home, the Engleberts conducted "a final, intensive examination of [their] client base, assessing profitability of accounts," wanting "to satisfy [themselves] that the economics of [their] client 'book' meant that [they] would have a viable business operating as an independent advisory firm." C. Englebert Aff. ¶ 23. Jamie shredded the physical documents after the analysis was complete. C. Englebert Aff. ¶ 23.

Based on that analysis, the Engleberts decided to approach Beirne and ask for a separation. On July 1, they traveled to Beirne's Connecticut headquarters and told executives that they wanted to end their business relationship. C. Englebert Aff. ¶ 15. Beirne, which had been considering shutting down its Pennsylvania operations for some time, was initially amenable to a separation with the Engleberts keeping their current clients. C. Englebert Aff. ¶ 16.

The Engleberts and Beirne discussed the technical details of the separation over the course of July 2019. They discussed issues relating to the transfer of funds from Fidelity, the custodian of Beirne clients' funds, to a new custodian. C. Englebert Aff. ¶ 17. Afterwards, Christopher downloaded client information to his personal computer that Fidelity said it needed to effectuate the transfer. C. Englebert Aff. ¶ 22(c). Also in July, Christopher downloaded budget information to his personal computer to assist in the exit negotiations. C. Englebert Aff. ¶ 22(b). Christopher states in his affidavit that all of this data has been deleted from his computers and accounts since then. C. Englebert Aff. ¶ 24.

Negotiations began to break down after July. At that point, Beirne was insisting that the Engleberts cash out of the firm, and that they pay a fee to start their new firm with the Beirne clients the Engleberts served at the time. C. Englebert Aff. ¶ 18. Beirne initially demanded $2 million, raising it to nearly $4 million over time. C. Englebert Aff. ¶ 19. The Engleberts refused.

According to Beirne, shortly after this disagreement in early August 2019, it discovered the existence of the Englebert Financial Advisers LLC registration and Christopher's new Pennsylvania securities registration, which the company claims raised compliance issues. Beirne Decl. ¶ 16. The firm placed the Engleberts on paid leave and investigated further. Beirne Decl. ¶ 17. During the investigation, Beirne technology staff discovered the data Christopher had downloaded and that Jamie had printed. Beirne Decl. ¶¶ 17, 18. Their investigation led Beirne to conclude that the Engleberts had been soliciting clients for their new firm, in contravention of their employment agreements, as well as their confidentiality and non-solicitation agreements. Beirne Decl. ¶¶ 19–21. Beirne eventually fired both of the Engleberts on August 12, 2019. Beirne Decl. ¶ 22. The Engleberts claim that Beirne still owes them $47,500 after the separation in unpaid compensation. C. Englebert Aff. ¶ 25(e).

The Engleberts began the operation of Englebert Financial Advising ("EFA") later that month. They told their parents, who had invested with the couple through Beirne, what had happened, and they told their parents that they were opening up a new firm. C. Englebert Aff. ¶ 29(b). Their parents subsequently moved their funds from Beirne to EFA. The Engleberts declare that they did not affirmatively tell anyone else of their separation from Beirne other than their parents. C. Englebert Aff. ¶ 29. Beirne disagrees, and in support produces one affidavit from its chief compliance officer asserting that 28 unnamed clients have indicated they were solicited by the Engleberts and that six have indicated they received a postcard announcing the creation of EFA. Decl. of Elizabeth Grano, Doc. 63. It also provides declarations from two named Beirne clients, Kenneth J.

5

Kressler and Terry C. Oswald, who declare that they received unsolicited communications from Christopher Englebert informing them that they could transfer their business to EFA from Beirne. Pl.'s Reply Mem. Ex. 1, Doc. 58; Decl. of Terry C. Oswald, Doc. 60.[2]

The Engleberts are currently serving former Beirne clients. In support of their opposition to the preliminary injunction, the Engleberts submitted declarations from six former Berine clients who independently decided to move to EFA. *See* Defs.' Mem. Ex. 3–8. They swore as follows:

- **Richard Vona (Ex. 3):** Vona heard from a third party that the Engleberts left Beirne in August 2019. He called Christopher using a cell phone number on an old Beirne-branded business card Christopher had given to Vona. On that call, Christopher confirmed that he and his wife had indeed left Beirne. Vona claims that a representative of Beirne reached out some time later. Vona told the representative that he would be transferring his accounts to EFA.

- **Regina Price (Ex. 4):** Price learned that the Engleberts had left Beirne when a Beirne representative called her and attempted to retain her business. Price reached out to Christopher a few weeks later and asked to transfer her accounts to him.

- **Margaret Mercatili (Ex. 5):** Mercatili arrived at the Beirne office in Pennsylvania on August 1 to meet with the Engleberts, but the Engleberts were not there. Mercatili reached out to Jamie, who responded, saying that "Beirne had directed she and Chris to refrain from contacting clients . . . ." , Mercatili continued to keep her funds with Beirne for some time afterwards before transferring her business to EFA.

- **Dawn Preston (Ex. 6):** Preston found out about the Engleberts' separation from Beirne on August 22, 2019, when a Beirne representative called her. The same day, Preston sent Christopher a text message, asking him to call her. They spoke by telephone, and Christopher told Preston that he had started a new firm but was not initiating contact with his old clients. During that conversation, Preston indicated that she wanted to transfer her accounts from Beirne to EFA. She did so in September 2019.

- **Michael Kipila (Ex. 7):** A representative of Beirne called Kipila on August 20, 2019, informing him that the Engleberts had left Beirne. Kipila called Christopher the next day. During that phone conversation, Christopher confirmed that he had left Beirne and had started his own firm. Christopher

---

[2] The Grano and Oswald Declarations were submitted 4 and 21 days, respectively, after the submission of Beirne's reply brief. The Engleberts have not objected to the Court's consideration of these declarations.

- told Kipilia that "he would be pleased to continue to handle [Kipilia's] account."
- **Edmund J. Harbison, Jr. (Ex. 8):** Harbison also found out about the Engleberts through a phone call from Beirne. After speaking with Beirne, Harbison left a voicemail on Christopher's cell phone. Christopher called back an hour later, confirming that he and his wife had left Beirne. He further said that "he was opening a new advisory firm and that he would be able to manage [Harbison's] accounts at a certain point in the future." Some time later, Harbison transferred his accounts to EFA.

In addition to these declarations of clients who did transfer their accounts, Christopher Englebert describes several conversations with other Beirne clients that did not result in a transfer. In particular, he avers that he would have social conversations at public gatherings with Beirne clients. C. Englebert Aff. ¶ 29(c). During those conversations, the topic sometimes transitioned to his departure from Beirne and an inquiry into whether the client should switch his or her account to EFA. C. Englebert Aff. ¶ 29(c). For example, he spoke to a Craig McAnally, a former client of Christopher's at Beirne, after running into him in a municipal building at which McAnally worked. C. Englebert Aff. ¶ 29(d). The men when to McAnally's office and continued the conversation there. C. Englebert Aff. ¶ 29(d). Christopher does not indicate that either the conversations at public gatherings or his conversation with McAnally resulted in a new client for EFA.

Altogether, Beirne claims that 45 percent of their Pennsylvania clients have moved to EFA as of November 2019. Beirne Decl. ¶ 25. Christopher Englebert agrees with this assessment and estimates that the total assets transferred are approximately $49 million. C. Englebert Aff. ¶ 29(g).

## II. DISCUSSION

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (internal quotation marks omitted) (emphasis removed). In the Second Circuit, "district courts may grant a

preliminary injunction where a plaintiff demonstrates irreparable harm and meets either of two standards: (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019) (internal marks omitted), *cert. granted*, No. 19-760, 2019 WL 6797733 (U.S. Dec. 13, 2019). The Court finds that Beirne has proven irreparable harm and likelihood of success on the merits and so grants its motion.

### A. Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). "To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent . . . ." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Faiveley*, 559 F.3d at 118.

Beirne first argues that it will suffer irreparable harm absent a preliminary injunction because the Engleberts stipulated as much in the agreements they signed when they were hired. But the Court will not treat these agreements as dispositive on this point — only persuasive. *See Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 348 (S.D.N.Y. 2018) ("In the Second Circuit, such contractual provisions, while not dispositive, support a finding of irreparable harm.").

Beirne next argues that it will suffer irreparable harm because, absent an injunction, the Engleberts will continue to use their relationships with former clients and proprietary Beirne data to transfer clients to their new firm. The Court agrees that such an injury would be irreparable. Calculating the money damages that could compensate

Beirne for clients lost in this manner, *post facto*, would be nearly impossible.  *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *Mercer Health*, 307 F. Supp. 3d at 347.

The Court further finds that such an injury is "actual and imminent."  The Engleberts have admitted to proactively telling their parents — who were Beirne clients at the time — that they had left Beirne and were starting a new business.  And they have admitted to accepting several more clients who defected from Beirne to keep their money with them.  Although the evidence is disputed over whether the Engleberts are actively soliciting clients through the use of post cards and telephone calls, the evidence is clear that they have accepted and now serve Beirne clients who have reached out to them, and that they are engaging in substantive conversations with Beirne clients whom they otherwise encounter.  If this behavior were to continue, then Beirne will continue to be harmed by the loss of clients to the Engleberts, a loss that cannot be remedied at the end of this litigation, should Beirne prevail.[3]

### B. Likelihood of Success on the Merits

"In order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

---

[3] The Engleberts argue that Beirne has waited too long to file its preliminary injunction, thus undercutting its case that it will suffer irreparable harm. *See Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 457 (S.D.N.Y. 2014).  But here, Beirne filed this case in August 2019, immediately after it alleges it was informed of the Engleberts' breach of their agreements, and only waited three months to move for this preliminary injunction. *Cf. id.* (denying preliminary injunction in part due to delay of one *year* between the alleged breach and the filing of the motion).  The small amount that Beirne did delay is credibly explained by Beirne's representations that it was seeking a way to settle this case during that time. *See* Beirne Decl. ¶ 24.

The confidentiality and non-solicitation agreements are clear:

> During his or her employment with the Company and for a period of twenty-four (24) months thereafter (the "Restricted Period"), the Employee shall not, in any function or capacity, whether for his or her own account or the account of any other person or entity (other than the Company or its affiliates), solicit the sale of, market, **or sell** products or services similar to those sold or provided by the Company or its affiliates to any of the clients of the Company or its affiliates (a "Client").

CNS Agreement § 5 (emphasis added).

Beirne is likely to succeed in showing that the Engleberts are in violation of this provision. The uncontroverted evidence proves that the Engleberts have sold wealth management services to Beirne's former clients. The Engleberts, through their declarations and the declarations of their current (and formerly Beirne) clients in support, have admitted as much. And they are arguably soliciting services whenever they inform former clients that they have left Beirne and have started their own firm. The Engleberts admit to proactively informing their parents of their situation, and they admit to telling other Beirne clients these same facts when the topic is brought up by those clients. Given that the confidentiality and non-solicitation agreements define solicitation, *inter alia*, as "verbal or written communication that is sent directly or indirectly to one or more Clients informing them [] that the Employee is no longer employed by the Company," CNS Agreement § 5, it is likely that the Engleberts telling Beirne clients that they had left Beirne could be a violation of section 5, as well — even in a social situation. This finding is buttressed by the declarations submitted by Beirne clients (i.e., Oswald and Kressler), who indicate they were solicited through telephone and postcard by the Engleberts.

The Engleberts do argue that the restrictive covenants of the employment agreement no longer bind them because Beirne itself is in breach for withholding pay worth $47,500. Although Beirne's behavior very may well expose it to liability under one of the statutory wages and hour claims the Engleberts have asserted in their counterclaim, the Engleberts have not pointed to a single clause in any of their signed

10

agreements — including the confidentiality and non-solicitation agreements of which they are most likely in violation — that such behavior would breach. They also argue the restrictive covenants do not bind them because they were involuntary terminated. *See Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010). But the rule stated in *Arakelian* only applies to terminations *without* cause, not *with* cause as is the case here — that is, because the Engleberts breached their employment agreements. *See id.* ("Enforcing a noncompetition provision when the employee has been discharged *without cause* would be unconscionable . . . ." (internal quotation marks omitted) (emphasis added)). The restrictive covenants binding the Engleberts are likely still in effect.

Finally, the Engleberts argue that Beirne is without clean hands in this matter and therefore is barred from requesting equitable relief. *See Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009). In doing so, they point to allegations they raise in their counterclaim and third-party complaint for defamation, failure to pay wages, tortious interference, and breach of contract. Doc. 48. But none of the allegations levied against Beirne, even if true, rise to the level of "immoral, unconscionable" conduct necessary to close the doors of equity. *See Hettinger v. Kleinman*, 733 F. Supp. 2d 421, 446 (S.D.N.Y. 2010) (finding allegations of bad faith, without more are insufficient to support finding of unclean hands).

## III.    CONCLUSION & ORDER

Accordingly, Beirne's motion for a preliminary injunction is GRANTED.[4] The Court will preliminarily ENJOIN the Engleberts from breaching the non-competition clauses Christopher Englebert's employment agreement and both Engleberts' confidentiality and non-solicitation agreements.

---

[4] In their briefing, the Engleberts ask the Court to "allow the Engleberts the opportunity to correct the record with their former clients" by sending a letter to clients "explain[ing] their separation without directly or indirectly encouraging clients to transfer their accounts from [Beirne] to EFA." The Court DENIES this request. The Engleberts have made no formal motion and, in any event, any such order would be advisory and outside the controversy presented by this case.

The Court, however, will allow the Engleberts to continue to serve their existing clients. The Court does not find that any harm suffered by Beirne from clients who have already switched to EFA can be remedied or prevented through this *preliminary* injunction. *See Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 355 (S.D.N.Y. 2018) ("There is no justification for enjoining the [defendants] from servicing or soliciting clients who have already chosen to retain their services.").

Therefore, it is ORDERED that Christopher Englebert and Jamie Englebert are enjoined from soliciting, marketing to, or accepting former, current, or prospective Beirne Wealth Consulting Services, LLC clients.

The parties are directed to appear on February 5, 2019 at 11:00 a.m. for the previously scheduled pre-motion conference on Beirne's motion to dismiss the Engleberts' Amended Counterclaim and Third-Party Complaint.

It is SO ORDERED.

Dated: January 30, 2020
New York, New York

_____
EDGARDO RAMOS, U.S.D.J.